Laurence R. KAMINS, Appellant,

v.

**BOARD OF ELECTIONS FOR the DIS-
TRICT OF COLUMBIA et al.,
Appellees.**

No. 7288.

District of Columbia Court of Appeals.

Argued Nov. 29, 1973.

Decided Aug. 13, 1974.

Laurence R. Kamins, pro se.

Earl A. Gershenow, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellees.

Before KERN, GALLAGHER and PAIR,* Associate Judges.

GALLAGHER, Associate Judge:

The question presented by this case is whether the Board of Elections of the District of Columbia (the Board) should have refused to count a write-in vote cast in the 1972 Presidential and Vice-Presidential election. For reasons which will hereinafter appear we hold that the Board should have counted such votes.

I

In August, 1972, Anton Wood, Treasurer of the D.C. Statehood Party, wrote the Board and requested that it announce publicly that an appropriate space would be provided for Presidential and Vice-Presidential write-in candidates on the general election ballot on November 7, 1972. He further requested that all such votes be counted. The Board responded that they could not be counted because the District of Columbia Election Act, D.C. Code 1973, § 1–1101 et seq., permits the Board to count only votes for those whose names *appear* on the ballot. Additionally, the Board pointed out that votes in the Presidential and Vice-Presidential election are actually cast for electors and that no candidates for elector can pledge themselves to unknown write-in candidates. The Board concluded that it thus did not believe it could provide space for write-in votes which by statute it was not permitted to count. To do so, the Board said, would encourage voters to cast invalid ballots.

On August 29, 1972, the D.C. Statehood Party transmitted to the Board the names of Dr. Benjamin M. Spock and Julius W. Hobson as their official candidates for President and Vice-President. Also transmitted were the names of the party's three electors along with affidavits of each elector attesting to their qualifications and swearing to vote for the candidates of the party as required by D.C. Code 1973, § 1–1108(g).

On November 1, 1972, Mr. Wood asked for clarification of the Board's position on write-in votes. The Board on November 3, 1972, reiterated its prior position and added that the obstacle to counting write-in votes for President and Vice-President "is that there is no mechanism in the law providing for the nomination of candidates for electors pledged to" write-in candidates. Only two means of nominating electors were available, said the Board, nomination by local executive committees of parties whose candidates had been elected after January 1, 1950, D.C. Code 1973, § 1–1108(d) or by nominating petition under D.C. Code 1973, § 1–1108(f). Finally, the Board noted that it could not permit the affixing of labels containing a write-in candidate's name because their electronic vote counting system was unable to read anything other than marks made by a No. 2 pencil.

On the eve of the election, November 6, 1972, Mr. Kamins, the appellant in this case, filed a petition for review of the

* Retired as of April 14, 1974.

Board's refusal to count write-in votes and a request for an injunction to permit him to cast a label ballot for candidates Spock and Hobson. This court, in an unpublished order, dismissed the petition as untimely and did not reach the merits of the write-in vote issue.[1]

On November 7, 1972, Mr. Kamins cast his vote for Spock and Hobson by attaching a sticker to the ballot which had their names printed on it. That evening, Anton Wood, an authorized and credentialed count watcher of the D.C. Statehood Party filed a protest of election procedure which noted that the Board had refused to count write-in votes cast by qualified voters for Spock and Hobson, thereby denying these voters suffrage.

On November 20, 1972, Mr. Kamins brought suit in Superior Court seeking, *inter alia,* an interlocutory injunction against certification by the Board of the general election results. Because service of the complaint was not effected until after certification, this portion of the complaint was dismissed as moot and Mr. Kamins was allowed to amend his complaint. The amended complaint alleged that 1) the Board's refusal to count his vote was illegal under D.C. Code 1973, § 1–1110(a)(2), 2) the Board's interpretation of D.C. Code 1973, § 1–1108(d) and (f) as disallowing write-in or sticker voting was erroneous, 3) the Board's decision not to count his vote denied him his suffrage without due process in violation of the Fifth Amendment to the Constitution, and 4) the failure

of the Board to count his vote denied him equal protection of the law under the Fourteenth Amendment. He asked the court to 1) order the Board to count write-in and sticker votes cast for Spock and Hobson in the 1972 general election, 2) establish procedures for future elections for counting write-in ballots, 3) order the Board to count write-in and sticker ballots in future Presidential and Vice-Presidential elections, 4) order the Board to promulgate regulations, pursuant to D.C. Code 1973, § 1–1105(d), whereby candidates for President and Vice-President whose names are not printed on the ballot might officially declare their status as write-in and sticker candidates and might officially file a slate of electors with the Board, and 5) order the Board, whenever publishing and whenever displaying the sample ballot to qualified voters, to conspicuously list all declared write-in or sticker candidates for any office to be filled by the immediate next election.

The Board answered and for the reasons stated previously denied that its action was either illegal or unconstitutional. The case came on to be heard on cross-motions for summary judgment and the court entered judgment for the Board. Mr. Kamins then appealed to this court.[2]

The Twenty-third II Amendment to the Constitution provides:

SECTION 1. The District constituting the seat of Government of the Unit-

---

1. Kamins v. Board of Elections, D.C.App. (No. 6890, Nov. 6, 1972).

2. "The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on [write-in] candidacies, will persist as [the statute is] applied in future elections. This is, therefore, a case where the controversy is 'capable of repetition yet evading review.' Rosario v. Rockefeller, [410 U.S. 752,] 756 n. 5, 93 S.Ct. 1245, 1249, 36 L.Ed.2d 1; Dunn v. Blumstein, [405 U.S. 330,] 333 n. 2, 92 S.Ct. 995, 31 L.Ed.2d 274; Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23

L.Ed.2d 1 (1969); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The 'capable of repetition yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks. The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held." Storer v. Brown, 415 U.S. 724, 737, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974).

ed States shall appoint in such manner as the Congress may direct:

A number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State, but in no event more than the least populous State; they shall be in addition to those appointed by the States, but they shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment.

SECTION 2. The Congress shall have power to enforce this article by appropriate legislation.

By amendment to the then existing District of Columbia election law, Congress explicitly provided two methods for appointing electors and by which candidates of political parties might have their names printed on the general election ballot. Thus, D.C. Code 1973, § 1–1108(d) provides:

Each political party who has had its candidate elected as President of the United States after January 1, 1950, shall be entitled to nominate candidates for presidential electors. The executive committee of the organization recognized by the national committee of each such party as the official organization of that party in the District of Columbia shall nominate by appropriate means the presidential electors for that party. Nominations shall be made by message to the Board of Elections on or before September 1 next preceding a presidential election.

This provision insured that Republicans and Democrats would be able to place their candidates on the ballot since both had elected a President at the time of the enactment, Dwight D. Eisenhower and John F. Kennedy. The second method for having candidates' names printed on the ballot is found in D.C. Code 1973, § 1–1108(f).

A political party which does not qualify under subsection (d) of this section may have the names of its candidates for President and Vice President of the United States printed on the general election ballot provided a petition nominating the appropriate number of candidates for presidential electors signed by at least 5 per centum of registered qualified electors of the District of Columbia, as of July 1 of the year in which the election is to be held is presented to the Board on or before the third Tuesday in August preceding the date of the presidential election.[3]

■ It is the Board's position that these two provisions are the exclusive means through which candidates may have their names printed on the ballot. We are in agreement with that basic proposition. It is consistent with every other nominating section of the code.[4] The Board goes on to argue, however, that only those names placed on the ballot in accordance with § 1–1108(d) and (f) "appear" on the ballot and that D.C. Code 1973, § 1–1110(a)(2) thereby limits the Board's power to counting only those votes cast for candidates whose names "appear" on the ballot through those provisions.

D.C. Code 1973, § 1–1110(a)(2) provides in pertinent part:

Each vote cast for a candidate . . . whose name *appears* on the general election ballot shall be counted as a vote cast for the candidates for presidential electors of the party supporting such presi-

3. The five per centum requirement of this section was changed to one per centum by Pub.L. 93–92, § 1(8)–(14), 87 Stat. 312, 313. *See* D.C.Code 1974 Supp., § 1–1108 (f).

4. *E. g.*, D.C.Code 1973, §§ 1–1105(b)(2), (3), 1–1108(c)(2), (i), (k), (*o*), (q).

dential and vice-presidential candidate . . . [Emphasis supplied.]

We think the Board's reading of the several sections of the statute is unnecessarily restrictive. We would agree with the Board that it limits their power to count ballots but only to the extent that they need not count votes for candidates for whom no slate of electors has been filed. The provision only implements the electoral college process inasmuch as D.C. Code 1973, § 1–1108(e) prohibits placement of the names of electors on the ballot and instead to avoid confusion, requires placement of the candidates' names. This is required even though under the Constitution it is the electors who elect the President and Vice President,[5] and it is for the electors that the people actually vote.

Given the value and importance of the right involved, however, we do not agree with the Board's position which, in effect, precludes a citizen from exercising his franchise in favor of candidates for whom a slate of electors has in fact been filed but whose names have not been printed on the ballot.

### III

The Supreme Court has said with reference to the right to vote: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964); Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). "To the extent that a citizen's right to vote is debased, he is that much less a citizen." Reynolds v. Sims, 377 U.S. 533, 567, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506 (1964). It is the "inalienable right" of

"each and every citizen" to participate fully and effectively in the political process, *id.* at 565, 84 S.Ct. 1362, and it is a "fundamental political right because [it is] preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Reynolds v. Sims, *supra* 377 U.S. at 562, 84 S.Ct. 1362.

After the passage of the Twenty-third Amendment, President Kennedy transmitted to the Congress implementing legislation "to permit the greatest possible number of citizens of the District of Columbia to share with their fellow Americans the basic right to vote for President and Vice President of the United States."

The report of the Senate Committee or the District of Columbia stated:

> The dispatch and determination with which the various States ratified the 23d amendment demonstrates a keen awareness on the part of their citizens that the residents of the District of Columbia should be provided the cherished right to vote in a national election. Their responsive action is, indeed, a challenge to the Congress to enact an election bill that will be looked upon as a model act.

> Your committee in its consideration of the provisions of the bill was essentially concerned with eliminating unreasonable restrictions on voting procedures. Wherever possible the Committee strived to adopt procedures that will allow the greatest number of responsible and qualified voters to cast their ballot.[6]

With regard to the specific provisions at issue here, D.C. Code 1973, § 1–1108(d) and (f), the legislative history indicates that they were directed not at limiting the right to vote, but simply at limiting the *printing of candidates' names* on the ballot. The

---

5. U.S.Const. art. II, § 1; U.S.Const. amend. XII.

6. S.Rep.No.869, 87th Cong., 1st Sess. 2 (1961).

report of the House Committee on the District of Columbia described § 1–1108(f) as a means by which a party might have "its electors [later changed to candidates] placed on the ballot." In addition, Congressman Broyhill, the author of the legislation, described it as providing for the appointment of electors "by whatever means the local political committee desires." 107 Cong.Rec. 15,729 (1961). Finally, when the legislation came back from conference and was presented to the Senate for final passage Senator Bible, Chairman of the Senate Committee on the District of Columbia, stated his belief "that this bill pursues a policy not inconsistent with the voting procedures already tested in most of the States." 107 Cong.Rec. 21,052 (1971).[7]

In addition to the legislative history, § 1–1108(f) is explicitly directed toward the *printing* of candidates' names on the ballot, as is § 1–1108(e) which relates to the two major parties.[8]

From all of this it is our conclusion that the thrust of those provisions was not to restrict the right of citizens to vote for candidates for whom qualified electors had been appointed but, rather, to prevent the necessity of printing on the ballot the names of candidates who are neither the nominees of the major parties nor able to muster the necessary number of signatures (now one percent) of registered voters required under § 1–1108(i). This distinction, as well as the interest in preserving the franchise, is at the root of our disagreement with the Board's position. What we think Congress has done is to limit the number of names on the ballot by "requiring some preliminary showing of a significant modicum of support before *printing*

*the name of a* political organization's *candidate* on the ballot . . ." Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). (Emphasis supplied.) The governmental interest served by this limitation is to avoid "confusion, deception, and even frustration of the democratic process at the general election." *Id.*

■ We reach our conclusion that the Board was in error when it failed to count appellant's vote not because the statute explicitly requires write-in votes to be counted, it does not, but because we do not believe Congress intended otherwise valid votes to be disregarded merely for the reason that a time-honored method of political expression had not been mentioned in the statute nor provided for by regulation. The fundamental nature of the right involved persuades us that construction of the statute in favor of the franchise is the course which we must follow since there is no compelling reason to do otherwise.

■ D.C. Code 1973, § 1–1105(d) provides:

The Board may prescribe such regulations as it considers necessary to carry out the purpose of this chapter, including a regulation permitting either persons temporarily absent from the District or persons physically unable to appear personally at an official registration place, to register in the manner prescribed in such regulation for the purpose of voting in any election held pursuant to this chapter.

Had Congress intended that the explicit provisions of the statute be the final word

---

7. The official state returns of twenty-six states reported write-in votes in the 1972 Presidential election. *See 1974 World Almanac & Book of Facts* 766–793, Richard M. Scammon, *America Votes 10 passim* (1972). While there are disparities between the two sources, the states appear to have been: Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Iowa, Maine, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, New Mexico, New York, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Wisconsin and Wyoming.

8. D.C.Code 1973, § 1–1108(e) states in part that "[t]he names of the candidate . . . shall be placed on the ballot . . . ."

on the exercise of the vote in this jurisdiction, this broad grant of rulemaking power to the Board would have been unnecessary. In our view, this portion of the statute should be utilized to facilitate write-in votes in the future as it has been utilized in the case of elections for Delegate and the Board of Education. 37 D.C.R.R. § 6.-3.⁹

■ In correspondence with appellant's colleagues, the Board also expressed as a reason for not counting write-in votes the fact that the electronic vote counting system was unable to read anything other than marks made by a No. 2 pencil. At oral argument appellant pointed out that his sticker vote for Spock and Hobson, along with others, was so positioned on the ballot as to cause the electronic vote counting machine to reject the ballot for easy hand counting. The government did not contest this. We conclude that the facilitation of vote counting provided by the Board's machines, when measured against the denial of franchise that results when a vote is not counted, does not further such

a substantial and compelling Board interest as to permit the Board to refuse to count write-in (or "sticker") ballots, Storer v. Brown, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974); American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 1305–1306, 39 L.Ed.2d 744 (1974); Dunn v. Blumstein, *supra*, 405 U.S. at 335, 92 S.Ct. 995. The Board's comments are not sufficiently weighty to alter our view. The administrative difficulty expressed is apparently one which can be solved without impeding the election machinery.¹⁰

IV

■ Our conclusion is that there is nothing in the statute regulating elections in the District of Columbia which precludes the counting of write-in votes in a presidential election where such votes are cast for candidates for whom, as here, a valid slate of electors has been filed.¹¹

"Voters are often not content to vote for one of the candidates nominated by the

---

9. Sec. 6.3 Write-in Voting Provisions
      (a) Write-in Voting Allowed. In any primary or general election for Delegate or election for member of the Board of Education, and elector desiring to vote for a candidate whose name is not printed on the ballot *shall be entitled to write in or affix a label* with the name of that candidate in the blank space after the printed names of candidates for the office. Write-in voting shall not be authorized in a runoff election and any write-in vote shall not be counted.
      (b) Affidavit Required of Winning Write-in Candidate. Any candidate elected by *write-in votes* shall file an affidavit with the Board that he meets all qualifications for office. [Emphasis supplied.]
   Despite the Board's reliance on § 1–1108(d) and (f) as precluding the nomination of electors in a manner other than there provided we note nevertheless that after a reading of the election code it appears that D.C.R.R. § 6.3 was apparently promulgated out of deference to the tradition of write-in voting rather than as a regulation implementing any part of the code which is in fact devoid of any mention of the procedure.

10. "We deal here with matters close to the core of our constitutional system. 'The right . . . to choose,' United States v. Classic, 313 U.S. 299, 314, 61 S.Ct. 1031, 85 L.Ed. 1368 [1941], that [the] Court has been so zealous to protect, means, at least, that States may no casually deprive a class of individuals of the vote because of some remote administrative benefit to the State. Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 [1948]." Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 780, 13 L.Ed.2d 675 (1965).

11. Provisions providing for such votes have been a factor in the Supreme Court's decisions in the right to vote area. *E. g.*, Storer v. Brown, *supra*, 415 U.S. at 736, 94 S.Ct. at 1282; American Party of Texas v. White, *supra*, 415 U.S. at 773, 94 S.Ct. at 1302; Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 1321, 39 L.Ed.2d 702, n. 5 (1974). *See also* Jenness v. Fortson, *supra*, 403 U.S. at 434, 436, 438, 91 S.Ct. 1970.

major parties. A write-in ballot permits a voter to effectively exercise his individually constitutionally protected franchise. The use of write-in ballots does not and should not be dependent on the candidate's chance of success. . . .

"The defendants have offered no satisfactory explanation for their prohibition of write-in ballots and their [legal] argument is untenable. . . . A blanket prohibition against the use of write-in ballots denies the qualified electors the right to freely participate in the electoral process as guaranteed by the 'equal protection' clause of the Fourteenth Amendment." Socialist Labor Party v. Rhodes, 290 F. Supp. 983, 987 (S.D.Ohio) (three-judge court), aff'd as to this part, modified in part on other grounds sub nom. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L. Ed.2d 24 (1968).[12]

The fashioning of relief, however, would be better left to the trial court which has not yet had the opportunity to do so. A remedy consistent with this opinion should be devised by the trial court.

Remanded for further proceedings consistent with this opinion.

12. Americans treasure the right to express their political preferences by means of the ballot." Socialist Labor Party v. Rhodes, *supra* at 986:

> Political participation is not limited to those who adhere to the tenets of one of the major political parties, but includes all citizens who wish to publicly demonstrate support for a certain candidate or political theory. . . .
> [O]ne need not have a good chance of winning to be a candidate for office. Just as the Constitution protects the right of individuals to express themselves freely, so does the Constitution permit these same individuals to seek support at election time. The right to vote is the right to vote freely and without unreasonable prohibitions as to the candidate of one's choice. [*Id.* at 987.]

"Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." Williams v. Rhodes, *supra*, 393 U.S. at 32, 89 S.Ct. at 11.

> Legislatures may provides for the printing of an official ballot and prohibit the use of any other, but they cannot restrict the elector [voter] in his choice of candidates, nor prohibit him from voting for any other than those whose names appear on the official ballot. [McCreary, American Law of Elections § 700 (4th ed. 1897)]. *See* People v. President, Village of Wappinger's Falls, 144 N.Y. 616, 39 N.E. 641 (1895); People v. Shaw, 133 N.Y. 493, 31 N.E. 512 (1892); *Cf.* Sanner v. Patton, 155 Ill. 553, 40 N.E. 290 (1895); State v. Dillon, 32 Fla. 545, 14 So. 383 (1893); Bowers v. Smith, 111 Mo. 45, 20 S.W. 101 (1892).